# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT COLUMBIA

| | |
|---|---|
| ANIL KINI, on behalf of THE UNITED STATES OF AMERICA,<br><br>6108 Blue Ridge Drive<br>Apartment E<br>Highlands Ranch, CO 80130<br><br>                    Plaintiffs,<br><br>    v.<br><br><br>TATA CONSULTANCY SERVICES, LTD.,<br><br>100 Park Avenue<br>26th Floor<br>New York, NY 10178<br><br>                    Defendant. | Civil Action No. _____<br><br>**FILED UNDER SEAL**<br>PURSUANT TO 31 U.S.C. § 3730(b)(2) |

Trial by jury demanded.

---

## COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT

---

*Qui Tam* Relator Anil Kini brings this Complaint pursuant to the False Claims Act, 31 U.S.C. § 3729, *et seq.*, on behalf of the United States against Defendant for fraudulently misusing certain work (H-1B and L-1A) and business (B-1) visas. The Relator, on behalf of the United States, seeks to recover all damages, civil penalties, and other remedies available under the False Claims Act against Defendant Tata Consultancy Services, Ltd. ("Tata").

## INTRODUCTION

1.     This action involves Tata's fraudulent misuse of the United States visa system to procure H-1B, L-1A, and B-1 visas for foreign workers' employment in the United States in violation of 31 U.S.C. § 3729, *et seq.* Tata commits visa fraud in order to maximize the number of work and business visas it can obtain from the U.S. government each year. Tata's actions deprive the government of its property interest in thousands of visas, significant revenue that would otherwise be derived from visa application fees, and significant tax revenue.

2.     For example, Tata submits H-1B visa petitions in excess of its actual staffing needs to the United States Citizenship and Immigration Services ("USCIS"). Tata falsely indicates in the visa petitions that a specific job at a specific location is available for the person for whom the company seeks the visa. However, these positions do not in fact exist, and Tata's certifications are false. Further, because H-1B visas are only available for employees seeking to perform specialty occupations in the United States, Tata falsifies employee roles listed in the H-1B visa petitions and certifies (falsely) that these employees will be working in specialty occupations which qualify for an H-1B visa once in the United States. Tata then uses these H-1B visa employees to perform non-specialized work in the U.S., in violation of the United States visa laws. These practices allow Tata to create an inventory of visa ready workers in India, available to travel to the U.S. at a moment's notice, once work becomes available.

3.     This action also involves Tata's failure to pay its H-1B visa workers the required wage rate, in violation of 20 C.F.R. § 655.731(a). While there are strict regulations governing the pay of H-1B visa workers in the United States, Tata fails to pay its visa workers the required wage rate, and instead pays these workers substantially less than its non-visa-reliant employees. As a result, the United States government is deprived of significant tax revenue.

4.      Tata commits similar acts of visa fraud in order to improperly secure L-1A visas for its foreign employees. While L-1A visas are only available to bring management-level employees to the United States on intracompany transfers, Tata improperly secures L-1A visas for technical employees intended to work in non-managerial roles in the U.S. In order to avoid fraud detection by USCIS, Tata instructs its employees to make backend changes in Tata's online Ultimatix system and to manipulate the roles and reporting structure for L-1A visa holders performing technical work in the U.S. so that these workers appear to be performing management-level, supervisory roles while on L-1A visas. These backend changes then allow L-1A visa holders to secure visa extensions so that they can remain in the U.S. for up to seven years. Because L-1A visa fees are lower than H-1B visa filing fees, Tata's practice of relying on L-1A visa holders in place of H-1B visa holders deprives the government of significant revenue.

5.      Further, this action involves Tata's improper use of B-1 visa workers to perform skilled and unskilled labor in the United States. Employees on B-1 visas may only perform certain, temporary activities in the United States, and are prohibited from performing the same work as non-visa-reliant employees and H-1B visa workers. However, Tata secures B-1 visas for employees to perform skilled and unskilled labor in the U.S., thereby violating the visa laws. Because B-1 visa fees are lower than H-1B visa application fees, Tata's practice of improperly relying on B-1 visa holders in place of H-1B visa holders deprives the government of significant revenue.

## THE PARTIES

6.      The Plaintiff in this action is the United States, by and through *Qui Tam* Relator Anil Kini. Relator Anil Kini was born in India, is a permanent resident (green card holder) of the United States, and resides in the State of Colorado.

7.      Defendant Tata Consultancy Services, Ltd. is an Indian multinational corporation that provides information technology and consulting services to customers located worldwide. Tata is headquartered in Mumbai, India and operates approximately 19 offices in the United States, including offices in Rockville, Maryland and Wilmington, Delaware.

8.      At all times relevant hereto, Tata conducted business in the District of Columbia and engaged in fraudulent conduct in the District of Columbia.

## JURISDICTION AND VENUE

9.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.*

10.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 3732(a) (False Claims Act) and 28 U.S.C. § 1331 (Federal Question).

11.      This Court has personal jurisdiction over the Defendant because it regularly provides information technology and consulting services to clients located within this District and committed acts proscribed by 31 U.S.C. § 3729  – acts giving rise to this action – within this District.

12.      Venue is proper in the District of Columbia under 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Tata conducts business within this District and committed acts proscribed by 31 U.S.C. § 3729 – acts giving rise to this action – within this District.

## FACTUAL ALLEGATIONS

### *Tata's Reliance on Visa Workers*

13.      Tata employs at least 29,900 workers in the United States, the vast majority (76% or more) of whom are visa workers. Tata made over $15 billion in revenue in the past fiscal year. The company derives over 50% of its revenue from North America, the vast majority of which is from the United States.

14.     Tata contracts with U.S. companies to provide IT-related services. Once Tata secures a contract with a client, it hires individuals to fill positions to service the client. Tata prefers to staff open U.S. positions with foreign workers for whom Tata secures visas.

15.     Tata secures three types of visas in order to bring foreign workers to the United States: H-1B, L-1A, and B-1 visas. First, Tata uses H-1B visa workers to staff the majority of its open U.S. positions. H-1B visas are intended to bring specialized foreign workers to the United States when there are insufficient workers in the U.S. to perform the jobs at issue. *See* 8 C.F.R. § 214.2(h)(1)(ii)(B); 8 C.F.R. § 214(i)(1). The open position must meet certain criteria to qualify as a specialty occupation, and the prospective H-1B worker must have attained a bachelor's degree or higher in the specific specialty, or its equivalent, to be qualified to accept the position. *See* 8 U.S.C. § 1184(i)(1). Moreover, as part of each H-1B visa application, the petitioner must establish that a specific job at a specific location is available for the person for whom the company seeks the visa. *See* 20 C.F.R. § 655.730(c)(4) (discussing required content of Labor Condition Applications that accompany visa petitions).

16.     Once in the U.S., H-1B visa workers must be paid the greater of the actual wage rate for the position (*i.e.*, the actual wage paid by the employer to other employees with similar experience and qualifications for the job at issue) or the prevailing wage (*i.e.*, the prevailing wage paid by other employers in the same geographic area for the job at issue), as required by 20 C.F.R. § 655.731(a). Employers must attest, as part of the H-1B visa application, that it will pay this required wage to the H-1B visa worker for his or her entire period of employment in the United States.

17.     Because the United States government imposes a strict cap on the number of H-1B visas issued annually, corporations must compete through a lottery system for the 65,000 visas

available each year (an additional 20,000 are reserved for individuals with advanced degrees). This process is extremely competitive. The filing period opens in early April, and if the H-1B cap is met within the first five business days of the filing period, USCIS will reject any H-1B visa petitions received after the cap is met. The cap is generally met within the first five business days (or very shortly thereafter). For example, in 2017, the filing period opened on April 3, and USCIS announced on April 7 (just four business days later) that it had received a sufficient number of H-1B visa petitions to reach the 65,000 cap. In total, 199,000 H-1B visa petitions were received by USCIS during the 2017 filing period. H-1B visa holders may work in the United States for a maximum initial stay of three years, which may be extended once for an additional three years. H-1B visa petitions are submitted under penalty of perjury.

18.    The total fee to secure an H-1B visa for a company like Tata is $6,460 (which includes: a base application fee of $460; an American Competitiveness and Workforce Improvement Act fee of $1,500 per petition for employers with over 26 employees; a $500 fraud prevention and detection fee; and an additional fee of $4,000 for employers with over 50 employees, 50% or more of whom have H-1B or L-1 visas). If the petition is not selected in the lottery, the application fee is refunded.

19.    Second, Tata secures L-1A visas for its foreign employees. L-1A visas are intended to be used to bring management level employees to the United States as part of an intracompany transfer. Employees on L-1A visas must supervise and control the work of other personnel, including the hiring, firing, and/or promotion of subordinate employees, or "if no other employee is directly supervised, [he or she must] function at a senior level within the organization hierarchy or with respect to the function managed." *See* 8 C.F.R. § 214.2(l)(1)(ii)(B). L-1A visa holders may

work in the United Sates for a maximum initial stay of three years, which may be extended twice in increments of two years. L-1A petitions are submitted under penalty of perjury.

20.    The fee to secure an L-1A visa for a company like Tata is $5,460 (which includes: a $460 base application fee; a $500 fraud prevention and detection fee; and an additional fee of $4,500 for employers with over 50 employees, 50% or more of whom have H-1B or L-1 visas).

21.    Third, Tata secures B-1 visas to bring foreign employees to the United States. B-1 visas permit foreign workers to enter the United States for an initial stay of up to six months for business purposes such as consulting with business associates, traveling for business meetings and conventions, acting as a speaker or lecturer, negotiating contracts, participating in training, and other temporary activities. Individuals on B-1 visas are not permitted to engage in skilled or unskilled labor while in the U.S., nor are they permitted to work full-time jobs. *See* 9 FAM 41.31 N7-N9.

22.    The fee to secure a B-1 visa is $160.

### *Relator Anil Kini*

23.    Relator Anil Kini was hired by Tata in April 2006 and began working for the company in India. In November 2012, Tata sought to secure new business with Western Union, and Mr. Kini was assigned to a Delivery Manager role to help support Tata during the contract negotiation process. Following these negotiations, Tata was awarded a 5-year contract with Western Union. Tata then selected Mr. Kini for an onsite Service Delivery Manager role on the Western Union client account in Denver, Colorado, and Mr. Kini relocated to the United States on an L-1A visa.

24.    From approximately June 2013 to September 2016, Mr. Kini reported to Tata Client Partner Malleshwar Karri, who was based out of Denver, Colorado. Mr. Kini currently reports to Client Partner Pushkar Bharadwaj.

25.    Mr. Kini was promoted from an Associate Consultant to a Consultant in January 2014.  He now acts as a Business Relationship Manager for Western Union, which is part of Tata's Banking and Financial Services vertical in North America. In this role, Mr. Kini manages the business development of the client by identifying and implementing IT-related services to meet Western Union's needs. As a Business Relationship Manager, Mr. Kini is considered part of the Western Union client account's leadership team. As part of this leadership team, Mr. Kini regularly communicates and interacts with members of Tata's senior leadership, including the corporate Human Resources Team. Thus, Mr. Kini has intimate knowledge of Tata's fraudulent visa practices perpetrated throughout the company's U.S. operations.

### Tata's Commission of H-1B Visa Fraud

26.    Tata employs a centrally-controlled process for the procurement of visas. Tata is comprised of multiple Industry Solutions Units ("ISUs"), each responsible for providing IT-related services to customers based on industry. Each ISU is led by an ISU Head. ISU Heads are generally Senior Vice Presidents or Executive Vice Presidents of the company who report directly to Tata executive leadership. The ISU Heads provide guidance and instructions regarding the procurement of visas to Client Partners, who manage the client accounts within the Unit. The Client Partners assist in the procurement of visas, and pass along instructions from ISU Heads regarding visa issues to Tata's Project Management Office ("PMO") team. The PMO team prepares H-1B visa petitions in compliance with the ISU Heads' instructions. The petitions are then filed by Tata's

Foreign Deputation and Facilitation Unit which is led by Amit Jindal, Head of Immigration & Compliance for North America.

27.    At the direction of senior management (including ISU Heads), Tata engages in visa fraud to procure the maximum number of H-1B visas possible each year. Tata commits H-1B visa fraud in at least two ways. First, in violation of visa law and regulations, Tata submits large numbers of visa petitions that falsely indicate that specific positions exist, despite the fact that the positions do not exist. Tata does so to maximize its chances of securing the highest number of H-1B visas from the visa lottery system. For example, Tata is consistently one of the top H-1B visa applicants in the country. In 2015, Tata received 7,936 new visas, while in 2016, it received 11,295 new visas, meaning it likely submitted around three times the 7,936 and 11,295 H-1B petitions in each of these years (given that only about one in three submitted petitions are randomly selected through the lottery system, *see* https://www.uscis.gov/news/alerts/uscis-completes-h-1b-cap-random-selection-process-fy-2016). Considering that Tata employs only about 29,900 individuals in the U.S., it is not possible that 25,000 to 30,000 new positions existed in each of these years. All, or almost all, of the individuals for whom Tata sponsors visas are from India.

28.    This practice allows Tata to create an inventory of visa-ready workers in India available to fill U.S. positions. These visa workers can relocate to the United States at a moment's notice once work becomes available within the company. Individuals in India with unutilized visas are mapped to open positions in the U.S. and are given first priority when work becomes available. Thus, Tata uses this inventory to promptly fill open positions in the U.S. with visa-ready foreign employees, as opposed to qualified workers residing in the U.S. who do not require a visa.

29. Because Tata files H-1B visa petitions in excess of its actual staffing needs and for positions that do not in fact exist, employees are often placed in locations and client accounts which differ from those listed in their visa petition.

30. Second, at the direction of Tata ISU Heads, including Ramana Murthy, Senior Vice President of Banking and Financial Services - North America, Tata falsifies employee roles listed in H-1B visa petitions in order to maximize the number of visa approvals it can secure each year. H-1B visa petitions are only available for employees seeking to perform specialty occupations in the United States, positions that require highly specialized knowledge. *See* INA § 214(i)(1); 8 C.F.R. § 214.2(h)(4)(iii)(A). However, Tata utilizes H-1B visa employees to perform low-level, non-specialized work in the U.S. In order to secure H-1B visas for these workers, Tata's Project Management Office team falsifies employee roles listed in the H-1B visa petitions and certifies (falsely) that these employees will be working in specialty occupations which qualify for an H-1B visa once in the United States. For example, certain job roles, such as manual testers and support analysts, do not qualify as specialty occupations, as they do not require highly specialized knowledge. In order to fill these positions with H-1B workers, Tata falsely lists jobs that require specialized skill on the workers' visa petitions, such as that of a web developer, in order to secure the visa approval. These false H-1B petitions are then approved and processed by Tata's Foreign Deputation and Facilitation Unit.

31. For example, Mr. Kini's observed that 90% or more of the H-1B workers deployed to the Western Union client account in Denver, CO, were falsely designated in specialty occupations despite performing non-specialized work. Client Partner Malleshwar Karri, at the direction of Tata ISU Head Rama Murthy, ensured that visa petitions for these individuals falsely designated specialty occupations. Web developer is considered a specialty occupation, while roles

10

such as support analyst are not. Pursuant to Mr. Karri and Mr. Murthy's direction, 90% or more of the H-1B visa workers deployed to Tata's Western Union client account submitted H-1B petitions falsely listing their role as web developer despite actuallying being support analysts or performing other non-specialty roles.

32.     While H-1B visa workers must be paid the greater of the actual wage rate for the position listed on the visa petition, or the prevailing wage, Tata's H-1B visa workers are paid substantially less – *e.g.*, 30% less – than non-visa-reliant workers.

33.     As a result of Tata's illegal H-1B visa practices, the government has been wrongfully deprived of its property interest in the visas, as well as the significant tax revenue that would have been generated from the employment of non-visa reliant workers.

*Tata's Commission of L-1A Visa Fraud*

34.     To circumvent the more burdensome H-1B visa regulations and strict yearly cap, Tata improperly secures L-1A visas for technical employees working in non-managerial roles in the U.S. In order to obtain L-1A visas for these employees, Tata falsifies these individuals' job titles and work responsibilities on their L-1A visa petitions and holds these individuals out as managers who will exercise discretion and control over Tata employees in the U.S. This false information allows Tata to maximize the number of L-1A visas it can secure from the federal government each year. Between 2002 and 2011, Tata sponsored 25,908 L-1 visas, the most of any company in the United States. Tata received 1,606 L-1 visa approvals in 2015, and 1,615 L-1 visa approvals in 2016.

35.     After Tata secures an L-1A visa for these workers, these employees are assigned to the United States to fill open positions servicing Tata clients. However, these employees are often placed in technical, non-managerial positions which differ from the roles listed in their visa

petitions. Such technical, non-managerial work cannot be performed by L-1A visa workers in the United States, and should rightfully be performed by U.S. citizens or legitimate H-1B visa holders.

36.    USCIS routinely conducts site visits to employers such as Tata in order to detect instances of visa fraud and to verify information listed in certain visa petitions. USCIS sends Fraud Detection and National Security officers to make unannounced visits to Tata worksites. During these visits, the officers conduct compliance reviews to ensure that employees' job titles and job responsibilities match those listed in their visa petitions. To avoid fraud detection, Tata's corporate Human Resources Team instructs all accounts to make backend changes in Tata's online Ultimatix system to conform L-1A visa holders' employee information to their visa petitions. Single Points of Contact in each account and the Human Resources Department manipulate the roles and reporting structure for L-1A visa holders performing technical work in the U.S. so that these workers appear to be performing management-level, supervisory roles while on L-1A visas. Tata also instructs its L-1A visa employees to lie about their job titles and job responsibilities to the Fraud Detection and National Security officers so that it may continue to perpetrate this fraud.

37.    These backend changes also allow L-1A visa holders to secure visa extensions, and as a result, these workers can remain in the United States for up to seven years. Tata's Foreign Deputation and Facilitation Unit is responsible for filing the visa amendments using this falsified information.

38.    Because these instructions to manipulate L-1A visa holders' job titles and reporting structure originate with the corporate Human Resources Team led by Ajoyendra Mukherjee, Executive Vice President and Head of Global Human Resources, and Narasimhan Srinivasan, Vice President of Human Resources, and because these instructions are relayed to account leadership

across the United States, instances of L-1A visa fraud are perpetrated throughout the company and in a uniform manner.

39.     Over the past year, Mr. Kini has been repeatedly instructed by Tata management to carry out these fraudulent L-1A visa practices. For example, on January 19, 2017, Mr. Kini and the Western Union account's Service Delivery Managers participated in a conference call with Suresh Nadam, Banking and Financial Services ("BFS") North America Operations Head. Mr. Nadam stated that Ajoy Mukherjee, Head of Global Human Resources, had instructed all accounts to correct the roles and reporting structure for all L-1A visa holders in the U.S. to match the information contained in the employees' L-1A visa petitions. Mr. Nadam stated that he had been authorized by Rama Murthy Magapu, BFS Industry Solution Unit Head, to share these instructions with all BFS North America accounts, and tasked Mr. Kini and the Service Delivery Managers with changing this information in Tata's online Ultimatix system. Mr. Nadam stated that this information was confidential and was not to be shared with any other Western Union associates. This call was recorded, as it took place on Tata's conference call bridge line, and it is Tata's practice to record all bridge calls.

40.     Later that day, Mr. Nadam provided Mr. Kini and the Service Delivery Managers with a list of twenty-two L-1A visa associates on the Western Union client account. This list was created by Narasimhan Srinivasan, Vice President of Human Resources. Mr. Kini and his colleagues were instructed to determine whether the L-1A visa holders' roles and reporting structure listed in Tata's Ultimatix system matched the information provided in the employees' visa petitions. Mr. Nadam asked Mr. Kini and his colleagues to make a list of any backend changes that needed to be made in Tata's online Ultimatix system to conform the L-1A visa holders' employee information to their visa petitions in order to avoid fraud detection by USCIS. While

Mr. Kini and the Service Delivery Managers were uneasy about completing this exercise, they were told by Mr. Nadam to keep their mouths shut and to provide him with the necessary changes within twenty-four hours. Mr. Kini immediately contacted Client Partner Pushkar Bharadwaj to make sense of these instructions, but was told not to question Mr. Nadam's order, as it originated from the corporate Human Resources Team. Given the magnitude and secrecy of the task, Mr. Bharadwaj then appointed Rajesh Nair as the Single Point of Contact for the Western Union account. He instructed him to coordinate with all Service Delivery Managers and subsequently with Human Resources to carry out the corporate mandate.

41.    Later that day, Mr. Kini and the Service Delivery Managers called each L-1A visa associate to obtain information on the role and span of control contained in the prospective project role description of each individual's visa petition. They then reviewed the roles and reporting structure within the Ultimatix system and created an excel sheet of required changes so that the Ultimatix information matched the prospective project role descriptions. Mr. Nair then worked with Human Resources to alter the L-1A visa employees' roles in the Ultimatix system through backend updates. For example, certain individuals with solutions architect, technical subject matter expert, and database administrator roles were changed to program managers and project managers in the Ultimatix system to match their visa petitions. These workers' reporting structure was then altered in Tata's Global Speed appraisal system to demonstrate purported control over other Tata associates.

42.    Over the next few months, Mr. Kini was repeatedly asked to help make similar changes in the Ultimatix and Global Speed systems to ensure USCIS compliance. For instance, in April 2017, Mr. Kini received an email from Rajesh Nair. Mr. Nair asked Mr. Kini to confirm the roles of the L-1A visa associates on the Western Union account so that non-compliant records

could be updated by Human Resources in the online systems. Mr. Nair instructed the email's four recipients to "keep this within this group only and not share this outside at all."

43.     Mr. Kini received the same instructions during a conference call on June 22, 2017. Following the call, Mr. Kini informed the Western Union account leadership, including Client Partner Pushkar Bharadwaj and Rajesh Nair, that this conduct was illegal as the L-1A visa holders were performing technical, non-managerial roles in the United States. Mr. Kini suggested that rather than manipulating the L-1A visa employees' information in the Ultimatix system, that the company file visa amendments to transfer the non-managerial employees to H-1B visas. However, Mr. Kini's suggestion was disregarded and Tata's fraudulent visa conduct continued.

44.     As a result of Tata's illegal L-1A visa practices, the government has been wrongfully deprived of its property interest in the visas. Additionally, because L-1A visa fees are lower than H-1B visa fees ($5,460 versus $6,460), Tata's practice of relying on L-1A visa holders in place of H-1B visa holders deprives the government of revenue it would otherwise collect.

***Tata's Commission of B-1 Visa Fraud***

45.     To circumvent the more burdensome H-1B visa regulations, governmental oversight, and strict yearly cap, Tata improperly secures B-1 visas to bring foreign employees to the United States to perform skilled and unskilled labor, which is prohibited by the U.S. visa law and regulations. *See* 9 FAM 41.31 N7-N9. Specifically, Tata transfers members of its foreign workforce to the U.S. on B-1 visas to perform labor that would otherwise be performed by U.S. citizens or H-1B visa holders. By circumventing the limitations set forth by U.S. visa laws, Tata is committing visa fraud.

46.     During his tenure with Tata, Mr. Kini observed Mr. Karri approving multiple B-1 visas so that offshore employees could travel to the U.S. to perform skilled and unskilled labor on

the Western Union client account. These B-1 visa holders would regularly perform work in the U.S. for up to six weeks. The practice of utilizing B-1 workers to perform skilled and unskilled labor is common across client accounts in the United States.

47.     Because B-1 visa fees are less costly than H-1B visa fees ($160 versus $6,460), Tata's practice of improperly relying on B-1 visa holders in place of H-1B visa holders deprives the government of revenue it would otherwise collect. Likewise, because neither the employer nor the B-1 visa holder pay taxes for his or her work (such as income taxes and payroll taxes), Tata's practice of improperly relying on B-1 visa holder to perform work in the United States deprives the government of tax revenue it would otherwise collect (from work performed by U.S. citizens, permanent residents, or H-1B visa workers).

### Mr. Kini's Whistleblower Report and Tata's Retaliatory Conduct

48.     On May 1, 2017, Mr. Kini submitted a 57-page whistleblower report to Rajesh Gopinathan, CEO of Tata, and Narasimhan Srinivasan, Vice President of Human Resources. The report detailed the fraudulent visa practices and other illegal, corrupt, and unethical conduct he had observed while working on the Western Union client account.

49.     On May 4, 2017, Mr. Kini received an email from Mr. Srinivasan confirming his receipt of the whistleblower report and informing Mr. Kini that the issues raised in the report would be investigated by an independent investigator. However, more than 50 days elapsed without any follow-up from Tata, or from an independent investigator.

50.     On June 22, 2017, Mr. Kini sent a 13-page follow-up report to Mr. Gopinathan and Mr. Srinivasan, detailing additional visa abuses and illegal practices within the Western Union client account since the time of his May 1, 2017 report.

51.     Five days later, Mr. Srivasan informed Mr. Kini that Manesh Patel, Partner at Ernst & Young LLP, had been appointed as the independent investigator, and that Mr. Patel would look into the issues raised in Mr. Kini's whistleblower report.

52.     Over a month later, Mr. Patel, who is located in India, contacted Mr. Kini to set up a call to discuss Mr. Kini's report. On September 5, 2017, Mr. Kini and Mr. Patel spoke for two hours by phone. During that call, Mr. Kini and Mr. Patel discussed the evidence supporting Mr. Kini's concerns of corruption and unethical practices within the Western Union account. However, Mr. Patel did not discuss the fraudulent visa practices Mr. Kini had detailed in his report and follow-up. This telephone call was recorded by Mr. Patel, who informed Mr. Kini at the start of the call that he was recording the discussion for future reference.

53.     As a follow-up to the call, on September 12, 2017, Mr. Kini sent Mr. Patel a 9-page file containing additional evidence (including emails and other documentation) of the fraudulent visa practices he had detailed in his report and follow-up. On September 18, 2017, Mr. Kini sent Mr. Patel a second file containing additional emails and documentation relating to Tata's visa fraud and efforts to conceal this fraud from Mr. Patel's audit.

54.     After receiving these materials, Mr. Patel instructed Mr. Kini to "not intervene in th[e] fact finding process" and told him to "refrain from performing any reviews on [his] own for the same matter" so that the investigation could be conducted in a timely manner and without bias from either party. Mr. Kini assured Mr. Patel that he was "not in any way trying to intervene in [Mr. Patel's] fact-finding process," but that he wanted to share "additional evidences" of Tata's visa fraud. Mr. Kini received no further communication from Mr. Patel following this email.

55.     After Mr. Kini submitted his initial whistleblower report to Tata leadership on May 1, 2017, Tata retaliated against Mr. Kini for speaking out against Tata's fraudulent conduct.

56.    When Mr. Kini was transferred to the U.S. payroll system in early 2017 (upon receiving his green card), he was incorrectly designated at a lower-level role (Service Delivery Manager) than the role he was actually performing (Business Relationship Manager). As a result, he was placed in a lower pay grade. While Tata initially informed Mr. Kini that this error would be corrected within a few months, after Mr. Kini submitted his whistleblower report, Tata informed Mr. Kini he would no longer be placed in the correct pay grade. Tata's refusal to correct Mr. Kini's role to a Business Relationship Manager is retaliatory, and is designed to punish Mr. Kini for speaking out against the company's fraudulent visa practices.

57.    Mr. Kini has been a top performer throughout his career with Tata. For instance, Mr. Kini received an appraisal score of 4.8 out of 5 (5 being the highest) for the 2016-2017 year, and has consistently received the top appraisal band of A since April 2014 (the bands range from A to E, with A being the highest). However, after filing his whistleblower report, Tata retaliated against Mr. Kini by stalling his promotion from Consultant to Senior Consultant. While Mr. Kini's promotion was approved by both his Client Partner, Pushkar Bharadwaj, and Industry Solution Unit leadership as part of the annual appraisal cycle in August 2017, it has yet to be approved by the corporate Human Resources Team.

58.    Tata also retaliated against Mr. Kini by stripping him of certain duties relating to his leadership role and excluding him from high-level decision-making affecting the client account. For instance, critical decisions regarding the Western Union client account have been made without Mr. Kini's knowledge, and he has been repeatedly removed from e-mail chains relating to his portfolios. Further, Tata removed three portfolios from Mr. Kini's control without any justification, which resulted in a reduction of Mr. Kini's team size by fifty or more employees.

These unilateral changes were made without Mr. Kini's knowledge or input, and were designed to punish Mr. Kini for filing his whistleblower report.

## CAUSES OF ACTION

### COUNT I
### (Violations of the False Claims Act)
### (31 U.S.C. § 3729)

59.     Relator re-alleges and incorporates Paragraphs 1 through 58 by reference as if fully set forth herein.

60.     Tata has knowingly presented, or caused to be presented, to employees of the United States, false and fraudulent claims for property or approval, in violation of 31 U.S.C. § 3729(a)(1)(A). Tata has knowingly made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B). Tata has knowingly made, used, or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the government, and has knowingly concealed and improperly avoided or decreased an obligation to pay or transmit money or property to the government, in violation of 31 U.S.C. § 3729(a)(1)(G). Tata's practices, discussed above, have deprived the government of its property interest in thousands of visas, substantial visa fees, and substantial tax revenue. For example, Tata submits H-1B visa petitions in excess of its actual staffing needs and falsifies employee roles listed in the H-1B visa petitions in order to maximize the number of H-1B visas it can secure from the government each year. Tata then pays these H-1B visa workers substantially less than its non-visa-reliant employees, resulting in significant tax revenue losses. Tata also circumvents the United States visa laws by fraudulently obtaining L-1A visas for employees performing non-managerial, technical work in the U.S. Tata also improperly utilizes B-1 visa workers to perform skilled and unskilled labor that should rightfully be performed

by non-visa-dependent employees or legitimate H-1B visa holders. Further, because both L-1A and B-1 visa fees are lower than H-1B visa fees, Tata's practice of improperly relying on L-1A and B-1 visa holders in place of H-1B visa holders deprives the government of revenue it would otherwise collect.

61.     For each False Claims Act violation, Tata is subject to penalties of up to $10,000 for each improper act and three times the amount of damages sustained by the government.

## COUNT II
### (Retaliation in Violation of the False Claims Act)
### (31 U.S.C. § 3730(h))

62.     Relator re-alleges and incorporates Paragraphs 1 through 61 by reference as if fully set forth herein.

63.     Relator has engaged in the following protected conduct in an effort to prevent one or more violations of the False Claims Act: (1) investigated, documented, and reported the allegations set forth herein to Tata leadership; (2) assisted the undersigned counsel in preparation of this complaint when Tata failed to take corrective action; and (3) prepared to disclose and disclosed Tata's fraudulent scheme to the appropriate government officials.

64.     In response to these actions, Tata retaliated against Relator for reporting Tata's fraudulent conduct and for refusing to participate in subsequent acts of visa fraud, as described above.

65.     Tata's retaliatory conduct has directly caused monetary damages and injury to the Relator.

66.     Pursuant to 31 U.S.C. § 3730(h), Relator is entitled to all relief necessary to make him whole, including, but not limited to, an award of back pay, with interest, compensatory damages, punitive damages, costs, and attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Relator Kini prays that the Court enter judgment against Tata, and in favor of the United States and Relator as follows:

a.  A declaratory judgment that the practices complained of herein are unlawful and violate 31 U.S.C. § 3729;

b.  Imposition of the maximum amount of civil penalties permitted for each of Tata's False Claims Act violations;

c.  Civil penalties in the amount of three times the actual damages suffered by the federal government as a result of Tata's actions;

d.  A permanent injunction against Tata and their officers, agents, successors, employees, representatives, and any and all persons acting in concert with them, from engaging in unlawful policies, practices, customs, and usages set forth herein;

e.  Relator seeks a fair and reasonable amount of any award for his contribution to the Government's investigation and recovery pursuant to 31 U.S.C. §§ 3730(b) and (d) of the False Claims Act, plus interest.

f.  Relator also seeks an award of back pay, interest on the back pay, compensatory damages, punitive damages, costs, and attorneys' fees pursuant to 31 U.S.C. § 3730(h) of the False Claims Act;

g.  Award all reasonable attorneys' fees, expert witness fees, expenses, and costs of this action;

h.  Pre- and post-judgment interest; and

i.  Such other relief on behalf of the Relator and/or the United States of America as this Court deems just and appropriate.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.


Dated: November 22, 2017                                    /s/Daniel L. Low
                                                           *Attorney for Relator*

                                                           Daniel L. Low (DC Bar #480910)
                                                           KOTCHEN & LOW LLP
                                                           1745 Kalorama Road NW, Suite 101
                                                           Washington, DC 20009
                                                           (202) 471-1995
                                                           (202) 280-1128 (Fax)
                                                           dlow@kotchen.com